J-S49045-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE:  ADOPTION OF W.F.S., A MINOR | : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF:  D.W.S., NATURAL FATHER AND K.M.J., NATURAL MOTHER | : : : : : : | No. 637 WDA 2017 |

Appeal from the Decree March 24, 2017
In the Court of Common Pleas of Armstrong County
Orphans' Court at No(s):  1 of 2016

BEFORE:   DUBOW, SOLANO, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                **FILED SEPTEMBER 15, 2017**

This is an appeal brought by D.W.S. ("Father") and K.M.J. ("Mother") (collectively "Parents") from the orphans' court's two decrees, both dated and entered March 24, 2017, which involuntarily terminated their parental rights to their minor son, W.S. ("Child"), born in September of 2014, pursuant to 23 Pa.C.S. § 2511(a)(5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[1]  For the reasons that follow, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] Taking a single appeal from multiple orders is generally discouraged, but case law has held that where the orders involve nearly identical issues, no objections have been raised to the appeal, and the time for filing a separate appeal has expired, such appeals may be addressed by this Court as if the appeals had been consolidated.  *See* Pa.R.A.P. 513; ***Commonwealth v. Cozzone***, 593 A.2d 860 (Pa. Super. 1991); ***General Electric Credit Corp.***
*(Footnote Continued Next Page)*

The orphans' court summarized the facts and procedural history of this case as follows:

### I. Findings[fn1]

1. [Child] was born [i]n September [of] 2014. (Transcript, at 211).

---

[fn1] The parties consented to the [orphans' court] taking judicial notice of the orders entered in the associated child dependency case, No. CP-03-DP-0000029-2014, and the factual findings contained therein. (Transcript, at p. 352). See Orders entered December 23, 2014; February 4, 2015; May 28, 2015; August 28, 2015; December 21, 2015; April 20, 2016; July 26, 2016; October 31, 2016; January 25, 2017; and March 20, 2017. Accordingly, the [orphans' c]ourt makes its findings herein based on the evidence presented at the termination hearing and the findings made in the related dependency case.

---

2. Parents are the Child's biological parents. They are unmarried. Mother does not have any other children and has never been married. Father has a teenage daughter with whom he has had no contact for many years. He was married previously for a short period of time. (Father's Ex. "A," at 3-4).

3. Father was 41 years old at the time of the hearing and is now 42 years old. Mother is 26 years old. (Transcript, at 216; Pet's Ex. 1, at 1).

*(Footnote Continued)* ⎯⎯⎯⎯⎯⎯⎯

***v. Aetna Casualty and Surety Co.***, 263 A.2d 448 (Pa. 1970). Such is the case here.

4. Mother and Father currently reside in a single-wide mobile home in Staley's Trailer Court in Kittanning, Pennsylvania. . . . (Transcript, at 142; 210).

5. Neither Mother nor Father is employed. Both Parents receive monthly Social Security benefits. Mother receives approximately $750.00 per month for a diagnosed disability of bi-polar disorder. Her step-grandfather, who acts as her representative payee, receives the benefits. He then gives Mother a portion of the funds and deposits the rest into a separate account in her name. Father receives approximately $875.00 per month for a disability associated primarily with asthma. Father also suffers from type-II diabetes, a heart condition, a kidney condition, and myalgia. Father is certified as a gunsmith and law enforcement armorer, but does not currently work in either field and has never earned a profit from either vocation. (Transcript, at 211-15; 303; 318-19; Father's Exs. "C" and "D").

6. Father does not drive and does not own an automobile. It appears that Mother also does not drive or own an automobile. (Transcript, at 249).

7. Prior to moving to Armstrong County, the parties lived for a period of time in McAdoo, Schuylkill County, Pennsylvania. They moved to Armstrong County shortly before the Child's birth. (Pet's Ex. 1, at 1-2; Mother's Ex. 1, at 1).

8. While residing in McAdoo, Parents had significant difficulties with their landlord and the conditions of their residence. When Parents returned to Armstrong County, Armstrong CYF received reports from Schuylkill County Children and Youth Services ("Schuylkill CYS") and the Healthy Beginnings program provided by the Pennsylvania Department of Human Services. Schuylkill CYS alerted Armstrong CYF that Mother had been diagnosed with bipolar disorder and Father had been diagnosed with schizophrenia, but neither were taking any medications. Armstrong CYF also was informed that Father had concerns about his inability to control his frustrations and that Mother was easily frustrated and mentally limited. Parents also did not have necessary items for a newborn child,

were not budgeting their money adequately, and would not discuss an appropriate schedule for the Child. (Pet's Ex. 1, at 2).

9. Healthy Beginnings reported that Father experienced delusions of grandeur and paranoia. In the report from St. Luke's hospital in McAdoo, where Father was evaluated to determine the best interests of the then-unborn Child, he was determined to be very unfocused and unable to concentrate enough on his health or diagnosis to "really do anything worthwhile." (Pet's Ex. 1, at 2-3).

10. Prior to moving to Schuylkill County with Father, Mother [was] treated for her mental health issues at Family Counseling Center of Armstrong County ("FCC"). She had consultations at FCC in 2011 and 2012 and entered the acute partial program in 2012 as a result of a hypomanic episode and related psychosis. She also related at that time a history of depression, childhood abuse, and family discord. (Mother's Ex. 1, at 3-4). She was diagnosed with bipolar disorder and was prescribed several medications to treat her symptoms. In 2013, her primary care physician took her off of her medications during her pregnancy. (*Id*.). Mother also reported that she ceased taking her medications in part due to Father's prompting. (Pet's Ex. 1, at 2).

11. Father has a long history of mental health diagnoses, chiefly schizoaffective disorder or schizophrenia, beginning when he was 17 years old. He has undergone voluntary psychiatric hospitalization on multiple occasions, the last of which was in 2010. Father disagrees with his diagnoses and believes that he has Asperger's Syndrome that is exacerbated by his myalgic back pain. Although he has taken several antipsychotic medications for many years, he has since ceased taking any medications because he believes they are harmful. (Father's Ex. "A," at 1-3; Transcript, at 260-64; 277-80, 282).

12. In addition to the reports from Schuylkill County, Armstrong CYF also received reports of odd and concerning behavior of both parents at the hospital. Accordingly, . . . the day after the Child's birth and before his discharge from the hospital, Armstrong CYF filed an Application for

Protective Custody. An Order for Protective Custody was entered the same date. The Child was placed in a temporary foster home, and a shelter hearing was scheduled for September 22, 2014. (Application for Order for Protective Custody and Request for Shelter Hearing, 9/19/14, at ¶¶ 5-9, Ex.'s C, D; Order for Protective Custody, 9/19/14; Transcript, at 160-61).

13. On September 22, 2014, Armstrong CYF filed a juvenile dependency petition alleging that the Child was dependent because he was without proper parental care and control pursuant to 42 Pa.[C.S.] § 6302. A shelter care order also was entered on September 22, 2014, by consent. The Child then was transitioned from foster care to the home of . . . the maternal grandparents ("Maternal Grandparents"). Parents were living with Maternal Grandparents at the time. They soon thereafter left the residence due to personal conflicts with Maternal Grandparents. Parents moved first into Staley's Motel and then into their current mobile home, which was in deplorable condition. (Shelter Care Order, 9/22/14; Dependency Petition, 9/22/14, at 4, 7-8; Transcript, at 161, 171-72).

14. On October 1, 2014, again by consent, the dependency adjudication hearing scheduled for that date was continued to permit Parents to undergo psychological evaluations and parenting assessments. Evaluations were performed by Dr. Terry O'Hara of Allegheny Forensic Associates. Dr. O'Hara is a Ph.D.-level psychologist who routinely is involved in dependency and child custody matters to conduct forensic and parental capacity evaluations. (Order, 10/1/14; Transcript, at 47-49).

15. Dr. O'Hara conducted his initial evaluations of Parents on October 9, 2014. He utilized multiple sources of information including interviews with and observations of Mother, Father, and the Child, together with collateral information from Armstrong County Memorial Hospital, Schuylkill CYS, and Armstrong CYF. Based on this information, Dr. O'Hara made recommendations regarding both Mother's and Father's mental health and parenting capabilities. At the time of the evaluations, Parents were

having daily visits with the Child. (Pet's Ex. 1, at 1-5; Transcript, at 52-53).

16. Dr. O'Hara diagnosed Mother with, among other things, a mood disorder. He diagnosed Father with schizoaffective disorder, paranoid type, together with several self-reported physical conditions. Dr. O'Hara acknowledged Father's instability and preoccupation with delusional thoughts and the dangers that these conditions would present to the Child if left untreated. He also noted Mother's self-reports of physical aggression toward Father, anxiety, and her own denial of her mental health conditions, which could prove severe. (Pet's Ex. 1, at 13, 18, 20-21; Transcript, at 58-60).

17. Dr. O'Hara concluded that there was insufficient evidence that Parents were able to appropriately meet the needs and Welfare of the Child. (Pet's Ex. 1, p. 22). He accordingly made the following recommendations: 1) acute individual psychotherapy and psychiatric care; 2) domestic violence therapy; 3) parenting classes and parental training, and 4) increase in support network. Dr. O'Hara indicated that Parents' mental health conditions had to be stabilized before any parenting skills training would be effective. He further recommended that all visitations should be supervised. (Pet's Ex. 1, at 21; Transcript, at 60).

18. The [orphans' c]ourt adjudicated the Child dependent by order entered November 10, 2014, with Parents' consent. Both Mother and Father stipulated to the findings that they had mental health diagnoses and were in need of mental health treatment. The order further identified as a condition of placement that Parents would follow through with the recommendations made by Dr. O'Hara. (Dependency Order, 11/10/14, at 1, 2).

19. Based on Dr. O'Hara's recommendations, Armstrong CYF developed a service/permanency plan for Parents. The plan established the following objectives: 1) address mental health diagnoses and comply with treatment recommendations; 2) obtain and maintain secure and appropriate housing suitable for the Child; 3) work toward

reunification; and 4) cooperate with Armstrong CYF. (Transcript, at 164).

20. Parents initially sought mental health counseling at Unity Family Services in Leechburg, Pennsylvania, on or about November 24, 2014. They met with Michele Gould, a master's - level counselor. After five sessions, Ms. Gould concluded that Father suffers from delusions of grandeur and that both parties had serious mental health issues. She recommended individual therapy for both Parents, which included the necessity of Father's acknowledgment of this diagnosis. She further recommended the continuation of supervised visits until the parents demonstrated appropriate parenting skills and compliance with treatment recommendations. (Father's Ex. B). Ms. Gould further recommended that an alternative foster or kinship placement for the Child be considered because of relational difficulties with Maternal Grandparents. (*Id.*).

21. After the first permanency review hearing held on December 23, 2014, both Mother and Father were found to be in minimal compliance with the directives in the permanency plan, although Mother had progressed well in bonding with the Child. Father was making less progress with bonding, but both were learning basic childcare skills. (Permanency Review Order ("PRO"), 12/23/15, at 1, 2-3).

22. Parents began having supervised visits at the home of [Mother's Cousin ("Maternal Cousin") o]n or about January or February 2015. . . . [Maternal Cousin] received instruction and training from Armstrong CYF and Holy Family Institute ("Holy Family") on how to supervise Parents' visits with the Child. The visits have been occurring consistently since the beginning of 2015 approximately two to three times per week. When under supervision, both parents, Mother in particular, have been able to adequately provide for the Child's basic needs. (Transcript, at 285-300).

23. Both Parents ceased having any treatment at Unity Family Services by early February 2015 because of what appear to be logistical difficulties. Although Mother claims that the fault lies with Unity, the [orphans' c]ourt finds that neither Mother nor Father exerted any significant

effort to ensure that treatment continued or that they were compliant with treatment recommendations. (Transcript, at 165-67; 328-29; Father's Ex. "B").

24. After the permanency review hearing on February 4, 2015, the [orphans' c]ourt found that Mother was showing moderate compliance with the permanency plan and moderate progress toward alleviating the conditions that led to p[l]acement, including progress during the visits with the Child and in beginning to address her mental health. Father still was showing minimal compliance, having not made any significant progress in visits with the Child or in pursuing mental health treatment. (PRO, 2/4/15, at 1, 2-3).

25. Father had a preliminary psychiatric evaluation with Dr. Manoj Lekwhani at FCC in early 2015. Dr. Lekwhani preliminarily diagnosed Father with a delusional or mood disorder and also recommended that he enter the acute partial hospitalization program, which would include group therapy. Part of the purpose of Father's participation in this program was to enable FCC to gather more information and make a more definite diagnosis. As part of the program, Father was referred to Dr. Mary Galonski, a psychiatrist at FCC, for treatment. Dr. Galonski concluded that Father had a schizoaffective disorder with features of schizophrenia and bi-polar disorder, including manic symptoms, delusions, thought disorganization, and rapid speech with grandiose and paranoid themes. Father remained in the partial hospitalization program for approximately two months. (Transcript, at 15-17, 20-23).

26. Dr. Galonski typically recommends individual psychotherapy and medication to treat schizoaffective disorders. She made those recommendations for Father, and ultimately prescribed for him a trial dosage of the drug Invega, which is an antipsychotic medication. Father took the Invega for a period of approximately two months during the summer of 2015, during which his symptoms improved to a degree, including his ability to sleep. FCC monitored Father's sugar levels while he was taking Invega, which was a concern. In August 2015, Father ceased taking the Invega after an episode in which he experienced chest pains and went to the emergency room.

There is no indication that the pains were caused by the medication, but rather likely resulted from a musculoskeletal issue. (Transcript, at 17-19, 26, 33-34).

27. Because of Father's resistance to both medication and Dr. Galonski's diagnosis, she referred him to Dr. Mahendra Patil, MD, another psychiatrist at FCC, for a second opinion in the fall of 2015. Dr. Patil made a similar diagnosis, but did not see any urgent need to force medication because he did not perceive Father to be a danger to himself or others. Father also treated on an individual basis with Michelle Gawlinski, a therapist at FCC, for a short period after he left the partial program. Father ultimately quit treatment with her because he did not believe it was helpful. Father then returned to treatment with Dr. Galonski, who again recommended medication and monitored treatment, including re-entry into the partial program. Her recommendations were rebuffed by Father, who ceased all treatment with FCC [o]n or about December 2015. He has not [been] treated for his mental health problems since that time, and his file at FCC has been closed. (Transcript, at 19-32; Father's Ex. "A").

28. Dr. Galonski opined that the appropriate treatment for Father's condition is a combination of medication, group therapy, and individual psychotherapy, and that therapy alone would be insufficient without medication. (Transcript, at 25, 30, 39-43).

29. After leaving treatment at Unity Family Services, Mother returned to FCC to be evaluated by Jason Benton, a nurse practitioner with whom she had treated prior to meeting Father and moving to Schuylkill County. In his evaluation, Mr. Benton reviewed Mother's treatment history for trauma, depression, ADHD, and hypomanic and psychotic episodes. She previously had participated in the acute partial program at FCC, but was not presenting with any significant psychiatric problems. Mr. Benton opined that, "[i]n regard to her ability to care for her son, there are no reservations from a psychiatric perspective at this time, but she would need considerable help and support for parenting skills and logistics." (Mother's Ex. 1, at 7-8). Mr. Benton again recommended the re-introduction of a medication regimen to prevent mood swings, but Mother

refused, stating that "meds will kill me." Mr. Benton did not perceive Mother to have any safety concerns, so he did not urge medication, but rather indicated that he would continue to build her trust so that she would take treatment suggestions in the future. (*Id.* at 9).

30. After the permanency review hearing held on May 28, 2015, both Mother and Father were showing moderate compliance with the goals in the permanency plan and moderate alleviation of the conditions that led to placement. Specifically, Mother showed progress in both bonding with the Child and in addressing her mental health conditions. Although Father showed less progress, it was nonetheless definite. At this time, an increased number of visits was recommended, and Mother was having additional visits on her own with the Child. (PRO, 5/28/2015, at 1, 2-3; Transcript, at 125-26; 317).

31. Mother continued intermittent individual psychotherapy at FCC through May 2016, when she terminated treatment. She has not received any treatment for her mental health conditions since that time. (Transcript, at 343-44).

32. Both Mother and Father also received visit coaching and in-home services from Holy Family. The visit coaching began in June 2015, at which time Parents had three supervised visits per week with the Child in their home. Counselors Sheena Johns and Jessie Cravener provided the services. The visits included supervision, coaching, and education of Parents regarding appropriate parenting methods and techniques. Initially, Mother was cooperating substantially with Holy Family, and both Parents were receptive to suggestions. (Transcript, at 114-118).

33. After the permanency review hearing on August 28, 2015, the [orphans' c]ourt determined that both Parents had progressed significantly in both compliance with the permanency plan goals and in improving the conditions that led to placement. Mother was indicated to be in "full compliance," having addressed both her mental health conditions and parenting skills. Father showed moderate progress in all of the permanency goals. He was taking Invega at this time, but not regularly as prescribed. He agreed at the permanency hearing to receive injections of

the drug to assure an appropriate maintenance dose, provided the administration of the injections was arranged for him. (PRO, 8/28/15, at 1, 2-3).

34. Mother and Father had 48 supervised visits with Holy Family. In August 2015, Holy Family believed that Mother, on her own, might be able to take the lead and help Father through the visits, which would otherwise be unsupervised. Mother and Father did not ultimately have any unsupervised visits, although Holy Family is not certain of the reason. (Transcript, at 126-135).

35. After an incident in Parents' home in September 2015, the visits supervised by Holy Family were moved to Holy Family's offices, where the visits continued until November 2015. During this period, Mother and Father regressed significantly in their cooperation with Holy Family. Parents ignored Holy Family's parenting recommendations, believing them to be outdated and irrelevant and preferring to follow the skills they learned watching "Supernanny." Parents also became more combative and argumentative. (Transcript, at 118-123; 232; Pet's Ex. "2," at 115).

36. On November 12, 2015, Parents arrived at Holy Family Institute for a pre-visit meeting, at which time Holy Family began to discuss with Parents appropriate methods for getting the Child to eat, rather than the method Father was using, specifically, holding the Child's mouth shut. The situation escalated with both Parents becoming irate. The visit ultimately was cancelled because of the incident, and all supervised visits at Holy Family's offices ceased at this time. (Transcript, at 123-24; Pet's Ex. "2," at 14-15).

37. Robert Flory of Holy Family provided in-home services to Parents at their residence. The services began in July 2015, at which time Mr. Flory developed a goal plan for the family. The plan included the goals of 1) ensuring safety and stability in the home, including enhancing Parents' abilities to protect the Child emotionally and physically, recognize child abuse and neglect, and maintain a clean and functional home; 2) understand the physical, emotional, and social development of the Child, and 3) recognize how unresolved family problems can impede

functioning and the need at attend counseling. (Transcript, at 14-141).

38. Mr. Flory recognized that the parties' home was an immediate issue given its structural unsoundness and age. Further, due to financial issues, Parents often did not have sufficient food in the home and were not attending to the basic maintenance of utilities. (Transcript, at 144-149; 154; 172-76; Pet's Ex. "1," at 11).

39. Mr. Flory attempted to convince Parents that the trailer was unlivable and that they should move, possibly into public housing. Father resisted moving into public housing because of his business providing gunsmith and armory services. Mother simply did not want to move. (Transcript, at 142-143; 159; 238-239; 314).

40. Parents did not have functional heat from December 2015 through the summer of 2016. During this period, they heated the residence with their electric oven and space heaters. These sources provided a safety hazard given the amount of clutter in the home, the use of extension cords, and the open oven door. (Transcript, at 144-149; 154; 172-76).

41. The issue with the parties' furnace was not resolved until November 2016, after the commencement of the termination hearing. The clutter and excess belongings that were making the home virtually unlivable and unsafe for the Child were partially removed in the summer of 2016 when Father completed the assembly of a storage shed that Parents had purchased in the fall of 2015. This problem was not significantly alleviated until after the termination hearing commenced. (Transcript, at 187; 236-37, 240; 275-77; 325-27).

\* \* \*

43. Parents both were re-evaluated by Dr. O'Hara in December 2015 to determine whether they had made any progress on the goals and recommendations established in their October 2014 evaluations. Dr. O'Hara reviewed materials provided by Armstrong CYF, including reports of Parents' difficulties with Holy Family, a decreased level of

interaction between Father and the Child, Father's continued diagnosis of schizoaffective disorder, and both Parents' psychiatric care progress. (Pet's Ex. 2, at 1-4). Dr. O'Hara again interviewed both Parents and observed their interactions with the Child. (*Id.*).

44. Dr. O'Hara opined that 1) Parents have a significant lack of understanding of child development; 2) there exist real concerns regarding Father's preoccupation with his delusions and his acknowledgment of the dangers of his "blind rages"; 3) Father was beginning to involve the Child in his delusions; 4) no progress would be made on parenting skills unless Parents' mental health issues were first adequately addressed; 5) the Child is at risk for physical abuse, exposure to extreme psychological instability, and domestic violence with Parents, and 6) the benefit of the minimal bond existing between Parents and the Child is outweighed by the Child's urgent need for stability, security, and safety. (Transcript, at 63-87).

45. Dr. O'Hara further opined that he did not see any evidence that Parents were able to care for the Child and that there should have been more progress given the level of services that were provided to them. (Transcript, at 65-66). He also opined that the termination of Parents' parental rights and subsequent adoption was in the best interest of the Child, notwithstanding the level of attachment that might exist. (*Id.* at 86-88; Pet's Ex. 2, at 17-19).

46. A permanency hearing was held on December 21, 2015, after Dr. O'Hara's second evaluation. Significant regression on the part of both Parents, particularly Father, was indicated. Father had stopped taking his medications and was continuing to deny his mental health diagnosis. Father's visits with Child also deteriorated, largely due to his preoccupations with socializing with supervisors and telling them a deluded personal history. Mother at this point was providing most of the care at visits, but still was not achieving an appropriate level of competency in caring for the Child. Because the Child had been in placement for more than 15 months, the [orphans' c]ourt directed CYF to file a petition to terminate parental rights. (PRO, 12/21/2015, at 1, 2-3).

Orphans' Ct. Op., 3/24/17, at 2-19 (footnote in original).

On January 14, 2016, Armstrong CYF filed a petition to terminate Mother's and Father's parental rights to Child. On November 15, 2016, November 18, 2016, and November 21, 2016, the orphans' court held hearings on the petition. Armstrong CYF presented the testimony of Dr. Galonski; Dr. O'Hara; Dr. Eric Bernstein, a licensed psychologist who performed an additional evaluation of Parents at their request; Sheena Jones, a family counselor at Holy Family; Robert Flory; and Athena Syput, Parents' caseworker. Mother presented the testimony of Maternal Cousin and testified on her own behalf. Father likewise testified on his own behalf. On March 24, 2017, the orphans' court involuntarily terminated Mother's and Father's parental rights to Child. On April 21, 2017, Parents filed a timely notice of appeal. Parents filed their concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b) on April 26, 2017.[2]

On appeal, Parents raise the following issues for our review:

---

[2] Although Mother and Father failed to comply with Pa.R.A.P. 1925(a)(2)(i), relating to children's fast track appeals, we decline to dismiss or quash their appeal. *See In re K.T.E.L.*, 983 A.2d 745, 747 (Pa. Super. 2009) ("the failure to file a concise statement of errors complained of on appeal **with** the notice of appeal will result in a defective notice of appeal, to be disposed of on a case by case basis." (emphasis in original)). Here, Mother and Father filed their concise statement five days after filing their notice of appeal. However, since the misstep was not prejudicial to any of the parties and did not impede the orphans' court's ability to issue a thorough opinion, the procedural error was harmless.

I. Did the [orphans'] court make a mistake in law or fact by terminating the parental rights of the natural parents?

II. Did the [orphans'] court abuse its discretion by terminating the parental rights of the natural parents?

Parents' Brief at 5.[3]

We review a decree terminating parental rights in accordance with the following standard:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted). The burden is upon the petitioner to prove by clear and convincing evidence that its asserted grounds for seeking termination of parental rights are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

---

[3] Parents framed their issues somewhat differently in their concise statement, but we find them sufficiently preserved for our review.

Moreover, we have explained:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

*Id.* (*quoting* **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003)). "The trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re M.G.**, 855 A.2d 68, 73-74 (Pa. Super. 2004). This Court need only agree with the trial court's decision as to any one subsection of section 2511(a) in order to affirm the termination. *See* **In re B.L.W.**, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

In **In re C.L.G.**, 956 A.2d 999 (Pa. Super. 2008) (*en banc*), this Court, sitting *en banc*, instructed as follows:

> [O]ur case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: determination of the needs and welfare of the child under the standard of best interests of the child. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child.

- 16 -

*Id.* at 1004 (citation and quotation marks omitted).

As this Court need only agree with the orphans' court relative to one section, we focus our analysis on section 2511(a)(8) and (b) which provide:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.**--The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

\* \* \*

**(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(8), (b).

Section 2511(a)(8) incorporates a three-part analysis. Termination of parental rights is proper under subsection (a)(8) if: (1) the child has been removed from parental care for twelve months or more since the date of

removal; (2) the conditions leading to removal continue to exist; and (3) termination would best serve the child's needs and welfare. ***In re M.E.P.***, 825 A.2d 1266, 1275-76 (Pa. Super. 2003). "As this Court has repeatedly indicated, termination under subsection (a)(8) 'does **not** require an evaluation of a parent's willingness or ability to remedy the conditions that led to placement of the children.'" ***In re I.J.***, 972 A.2d 5, 11 (Pa. Super. 2009) (quoting ***In re Adoption of R.J.S.***, 901 A.2d 502, 511 (Pa. Super. 2006)) (emphasis in original). Instead, subsection (a)(8) "requires only that the conditions continue to exist, not an evaluation of parental willingness or ability to remedy them." ***Id.*** (quoting ***C.L.G.***, 956 A.2d at 1007).

Therefore, the relevant questions are whether the parent has remedied the conditions that led to the removal of the child and whether the child's reunification with that parent is imminent at the time of the termination hearing. ***I.J.***, 972 A.2d at 11; ***see, e.g.***, ***R.J.S.***, 901 A.2d at 512 (termination under (a)(8) was appropriate where Mother was not in a position to parent her children at the time of the termination hearing). As we have previously stated:

> We recognize that the application of [subsection] (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a

> parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen months, in which to **complete** the process of either reunification or adoption for a child who has been placed in foster care.

**I.J.**, 972 A.2d at 11 (quoting **C.L.G.**, 956 A.2d at 1005) (emphasis in original).

Our review of the record supports the orphans' court's decision to terminate Parents' rights pursuant to section 2511(a)(8). At the time of the termination hearings, Child had been in placement continuously for over twenty-six months. This is well beyond the twelve-month requirement subscribed by subsection (a)(8). Thus, the first prong of section 2511(a)(8) is established beyond dispute.

As to the second prong, the orphans' court was required to determine whether the conditions leading to Child's placement persisted, despite the agency's reasonable good faith efforts. Parents argue that they were compliant and/or partially compliant in remedying the conditions that led to Child's removal. Parents' Brief at 13. In particular, the extent of Parent's argument on this point is as follows: "Mother is compliant with her mental health treatment. Father is partially complaint, in that he attends meetings with his providers, however, Father refuses to take the medication that has been prescribed to him." **Id.**

In its opinion, the orphans' court set forth multiple conditions that led to Child's removal, which it described as follows:

The original dependency adjudication and disposition order, entered with Parents' consent, identified both Parents' mental health diagnoses as the preeminent conditions requiring the placement. That order directed that they comply with the recommendations made by Dr. O'Hara after his November 2014 evaluations. Further, the permanency plan put in place by Armstrong CYF included Dr. O'Hara's recommendations and further indicated that Parents should obtain suitable housing for the Child, progress toward reunification, and cooperate with Armstrong CYF. Dr. O'Hara noted specifically in his evaluation report that Parents' mental health conditions would have to be addressed and stabilized before parental training could be effective.

Orphans' Ct. Op. at 27-28.

The orphans' court then explained its determination that these conditions continue to exist:

Parents, at times, made progress with these recommendations. Regarding parenting skills, the permanency review orders entered by the [orphans' c]ourt in the spring and summer of 2015 indicate that Mother was compliant with the permanency plan and making progress toward reunification. The [orphans' c]ourt's findings in those orders indicate that Mother was bonding with the Child, was taking the lead at visits and providing the bulk of the childcare, and was having additional supervised visits on her own with the Child. At one point in August or September 2015, Holy Family recommended that Mother have unsupervised visitation with the Child, which ultimately did not occur. There is little evidence in the record of the reason why the unsupervised visits did not begin. Also at some point in 2015, Mother had, for a period, extra visits alone with the Child. It is not clear whether this was the same time that Father's visits were suspended because of unacceptable behavior. (Transcript, at 227).

It also is clear, however, that beginning in or about September 2015, Mother began to regress in her abilities to provide care for the Child. Visits supervised by Holy

Family were moved to Holy Family's offices because of an incident at Parents' home. Both Parents became increasingly hostile with Holy Family professionals and would not heed their teaching or instruction. Both Mother and Father reiterated their outright-rejection of Holy Family's instruction at the termination hearing.

Regarding Mother's mental health, she had received treatment for a number of years, including, several years before she met Father, moved to Schuylkill County, became pregnant, and moved back to Armstrong County with Father to have the Child. Although she previously was prescribed medications to control her mood and prevent any manic episodes or psychosis, she ceased taking any medications in 2013 and has not resumed, despite the recommendations of Mr. Benton. Mother began counseling with Ms. Gould at Unity Family Services, although she did not continue there for what are unclear reasons. After an initial psychiatric evaluation at Family Counseling Center, Mother began individual counseling, which continued until the spring of 2016, after the termination petition was filed.

Although medications were recommended for Mother by Mr. Benton, the nurse practitioner by whom Mother was evaluated at FCC, Mother refused the medications, which clearly was at Father's prompting. Although Mother believes that the medications are dangerous and that she does not need them, she admits to having acted out in physical aggression toward Father. Further, it was Mother's uncontrolled outburst and aggression that prevented the visit that was supposed to happen at Holy Family offices in November 2015. (See Pet's Ex. 2, at 14-15). All visits were cancelled after that date because of the ongoing resistance from both Parents.

Mother also continues to ignore Father's mental health condition. This, in fact, is the primary ongoing and quite paralyzing problem with Mother: she will not acknowledge Father's mental health conditions and buys into his delusions and rash behavior. (See Mother's Ex. "1," at 1). As a result, she stunts her own progress with the Child and continues in what appears to be a thorough-going denial about the need for treatment.

- 21 -

Father has continually and quite obstinately refused to accept his primary mental health diagnosis: schizoaffective disorder or schizophrenia. The record is clear that Father has suffered from this condition and related conditions from his adolescence. He was hospitalized for psychiatric care on at least four occasions, has been prescribed numerous medications through the years for his condition, and has been diagnosed with a schizoaffective disorder, or at least a delusional disorder, by two psychologists (O'Hara and Bernstein), three psychiatrists (Lekwhani, Galonski, Patil), and one therapist (Gould), all since the Child has been placed. He adamantly disagrees with all of these diagnoses and continues to claim that he suffers from Asperger's Syndrome, which is exacerbated by his lower back myalgia.

Father's obstinacy in this regard and his unwillingness to treat is of grave concern to both the psychologists who evaluated him and to th[e orphans' c]ourt. Since . . . the filing of the termination petition and thereafter, Father's visits with the Child have deteriorated and he has now discontinued all mental health treatment. There is no evidence in the record that Father at present, or at any time prior, has or had the independent capability of providing for the Child's needs. Regarding his mental health and parenting capabilities, all sources indicated that Father is in exactly the same position at present as he was two and one-half years ago.

Regarding suitable housing, the condition of Parents' residence had not improved as of the date the termination petition was filed and, in fact, had worsened at times. Parents initially resided with Maternal Grandparents, where the Child was placed after foster care. Parents resided in that residence for a short period with the Child. (Transcript, at 193-94). They then moved out of the home because of a conflict that Father had with Maternal Grandparents. They first resided in Staley's Motel and then moved into a very old single-wide trailer that was considerably dilapidated and in need of immediate structural work. The condition of the interior of the home worsened through 2015, when Parents moved all of their belongings from Maternal Grandparents['] home to the

- 22 -

trailer, eliminating any extra space. Parents then were relegated to sleeping on a mattress in the living room, where they had placed their dressers and bedroom furniture as well. The entire back half of the trailer was unusable much of the time because of the considerable amount of clutter.

Further, beginning in the winter of 2015, Parents' furnace quit working. Although they gave several excuses as to why it was not fixed until approximately a year later, the [orphans' c]ourt finds none to be acceptable given the simple and cheap repair that was made in November 2016. Parents utilized space heaters and their kitchen oven for heat from December 2015 through November 2016, which created obvious and significant safety hazards that were not ameliorated until after the termination hearing began. Although currently the furnace is operational, the shed is constructed, and the clutter issue has been resolved to a degree, the [orphans' c]ourt is unsatisfied that the home is yet capable of housing a young child. The [orphans' c]ourt also has serious reservations that Parents recognize the need to maintain a safe residence for the Child, as they would not take any real steps in that direction until the threat of termination of their parental rights was imminent.[fn5]

---

[fn5] Mr. Flory encouraged Parents to consider moving from the trailer at Staley's into either public housing or another suitable option. Mother refused to leave that location because she was tired of moving. Father contends that he attempted to find other housing, but would not consider public housing because the housing authority would not permit him to live there with his gunsmithing and armoring businesses, neither of which he has ever established.

Orphans' Ct. Op. at 28-33. After a careful review of the record in this matter, we find that there is ample, competent evidence to support the

orphans' court's factual findings, and that the court's conclusions are not a result of an error of law or an abuse of discretion.

The record reflects that Mother refused to take medications recommended for her mental health diagnoses and stopped attending weekly outpatient therapy. N.T., 11/15/2016, at 196; N.T., 11/24/2016, at 320-21. Likewise, Father refused to accept his diagnoses of schizoaffective disorder and stopped taking the medication he was prescribed. N.T., 11/15/2016, at 17-19.

Moreover, despite Armstrong CYF informing Parents on numerous occasions that their trailer was not acceptable housing, Parents refused to attempt to remedy the issue until the week of the termination hearing. In fact, Armstrong CYF made a visit to Parents' home on November 10, 2016 (five days before the first scheduled hearing date) and, again, noted that Parents' trailer was not suitable housing for Child. N.T., 11/24/2016, at 325-26; *see also* 23 Pa.C.S. § 2511(b) ("With respect to any petition filed pursuant to [subsection (a)(8)], the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving notice of the filing of the petition.").

While testimony presented supports the contention that Mother began to make some progress towards her goals, that progress was short lived. Following an incident that took place at Parents' house in September 2015, Parents began to regress significantly in achieving their goals. N.T.,

11/15/2016, at 118-23, 232. Notably, Parents became hostile towards Holy Family professionals, refusing to heed to their recommendations and instructions. *Id.* Holy Family subsequently terminated in-home services with Parents, deeming Parents to have made "no progress" despite the extensive services that were provided to them. *Id.* at 145-47. In this regard, the orphans' court stated:

> Indeed, a remarkable factor in this case is Parents' lack of progress given the level of services that were provided. Armstrong CYF and the providers it has utilized have acted in good faith and with timely diligence in attempting to assist Parents in achieving reunification and permanency. Parents have received psychological evaluations on multiple occasions and have met with psychiatric care providers again and again. Holy Family provided visit coaching and in-home services for many months, attempting to assist Parents with parenting skills and maintaining a safe, stable, and suitable home for the Child. Both Dr. O'Hara and Dr. Bernstein opined that, as of December 2016 and September 2016, neither parent was capable of independently caring for the Child nor would be in the immediate future. Dr. O'Hara noted specifically his concern with the lack of progress given the amount of services provided.

Orphans' Ct. Op. at 34-35. We thus conclude that the record supports the finding that the conditions that led to Child's removal had not been remedied at the time of termination, and that reunification between Child and Parents remained untenable after over twenty-six months of Child being in kinship foster care. Therefore, the second prong of section 2511(a)(8) was met.

The third requirement of subsection (a)(8) and section (b) both require that we consider whether the termination of parental rights would best serve

the needs and welfare of the child; however, these are distinct inquires. As

this Court has previously stated:

> We note that, initially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the needs and welfare of the child prior to proceeding to Section 2511(b), which focuses on the developmental, physical and emotional needs and welfare of the child. Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the 'needs and welfare of the child,' we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the 'needs and welfare' … as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*C.L.G.*, 956 A.2d at 1008-09 (internal citations omitted).[4] As such, we begin

by considering the needs and welfare of Child only as contemplated by

section (a)(8).

_____

[4] The orphans' court, in writing its decision, analyzed both the third prong of subsection (a)(8) and section (b) together. Pursuant to *C.L.G.*, the orphans' court should provide a separate needs and welfare analysis under subsection (a)(8) before proceeding to a section (b) analysis. Our review of the record, however, reveals that the orphans' court's decision, although written together, encompassed a thorough and complete subsection (a)(8) **and** section (b) analysis. Therefore, in light of our disposition of Parents' substantive argument, we conclude that it would be unnecessary to remand
*(Footnote Continued Next Page)*

As stated above, when considering the needs and welfare of a child under Section (a)(8), we focus on the needs of the child in addition to the behavior of the parent. *Id*. The record reflects that Child was a newborn when he was removed from Parents' care. Since that time, Child has been diagnosed with several conditions, including autism, a depth perception disorder, and a physical deformity of his feet. N.T., 11/15/2016, at 162-63. Accordingly, Child receives four different ongoing in-home services for these conditions, including speech therapy, occupational therapy, physical therapy, and special instruction therapy. *Id.* at 162.

Child is placed in a pre-adoptive home. *Id.* at 161. The record reflects that the foster parents, Maternal Grandparents, are addressing Child's extensive special needs. *Id.* 162-63. He is largely nonverbal, and requires between four and six hours of therapy each week. *Id.* at 163. Child is thriving in the foster home and Dr. O'Hara testified that Child's primary bond is with Maternal Grandparents. *Id.* at 86. Dr. O'Hara also testified that Child's need for "security, safety, stability, consistency, [and] responsiveness" is intensified by his special needs. *Id.* Dr. O'Hara opined that Parents do not "have any capability to appropriately care for the needs and welfare of [Child]." *Id.* at 66. Dr. O'Hara testified that until Parents' mental health conditions were addressed and stabilized, Parents would not

_(Footnote Continued)_ _____

the matter so that the orphans' court may merely separate its analysis into two separate sections.

be able to develop healthy parenting skills. *Id.* Accordingly, because Parents' have not addressed those concerns, Dr. O'Hara testified that Child is at an increased risk of child abuse, exposure to extreme psychological instability, domestic violence, and homelessness. *Id.* at 70.

Based upon the testimony presented at the hearings, we conclude that the record supports a finding that termination would serve Child's needs and welfare under section 2511(a)(8). Competent record evidence was presented to meet all of the elements of section (a)(8). Therefore, the orphans' court did not err in terminating Parents' rights to Child on that basis.

We now turn our attention to 2511(b) and examine whether the orphans' court properly found that termination of Parents' rights was in the best interest of Child. "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d at 1287 (citation omitted). The orphans' court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. *Id.* The mere finding of a parent-child bond does not preclude termination of parental rights. Rather, the orphan's court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa. Super. 2003).

Based on the length of time Child has been in foster care, the age at which he was removed from Parents' care, the finding that Parents' have been non-compliant with their goals, and how well Child is doing in his pre-adoptive placement, the orphans' court concluded:

> . . . [A]lthough there is a degree of attachment between Parents and the Child, perhaps more so between the Child and Mother, such that the Child does not appear to be uncomfortable in Parents' presence, *see* Transcript, at 178-82, the Child's need for stability and consistency in his life, particularly due to his special needs, is paramount and outweighs any detriment of severing that attachment. The Child has never been in Parents' primary care and all evidence indicates that Maternal Grandparents have provided a stable and suitable home for him. Other than Parents' own desire to maintain a relationship with the Child, which the [orphans' c]ourt does not discount but also does not consider as controlling, there is little evidence that terminating Parents' parental rights will destroy an existing, necessary and beneficial relationship with the Child. *See* Transcript, at 86-88.

Orphans' Court Opinion, 3/24/2017, at 37-38.

Based upon the evidence cited *supra*, the record supports the orphans' court's conclusion that termination of Parents' parental rights is in Child's best interest. **See** *supra*, pp. 2-19. As the orphans' court did not abuse its discretion, err as a matter of law, or rely on insufficient evidentiary support for its conclusions, we affirm its decision.[5] **See In re B.L.W.**, 843 A.2d at 383.

---

[5] We note that the Child's guardian *ad litem* ("GAL") filed a brief in support of the termination decree. However, we recognize in the recent case **In Re Adoption of L.B.M.**, 161 A.3d 172, (Pa. 2017), our Supreme Court held that trial courts must appoint counsel for a child involved in a contested

*(Footnote Continued Next Page)*

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/15/2017

_(Footnote Continued)_ _____

termination petition when the legal interests of such child are divergent from her best interests.  In this case, although Parents did not challenge Child's lack of counsel, a review of the record does not reveal any conflict between Child's legal interests and best interests.  At the time of the termination hearing Child had recently turned two years old and was too young to express a preferences regarding Parent's parental rights.